**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : 3:17-CR-158 |
| v. | : (JUDGE MARIANI) |
| | : |
| DONALD ROYCE, | : |
| | : |
| Defendant. | : |

## MEMORANDUM OPINION

### I. INTRODUCTION

The Court held a hearing on Defendant's competence to stand trial on November 22, 2021. At the Competency Hearing, the Government presented one witness, Dr. Tracy O'Connor Pennuto, and Defendant did not produce witnesses or present evidence. Having conducted the Competency Hearing and reviewed the record developed in this case, the Court concludes that Defendant is competent to stand trial.

### II. FACTUAL AND PROCEDURAL BACKGROUND

On May 16, 2017, Defendant Donald Royce was charged in a nine-count indictment with one count of mail fraud in violation of 18 U.S.C. § 1341 and eight counts of preparation and presentation of a false and fraudulent return in violation of 26 U.S.C. § 7206(2). (Doc. 1). On September 21, 2018, Defendant entered a Notice of Mental Health Defense and subsequently filed a Motion to Determine Competency to Stand Trial Pursuant to 18 U.S.C. § 4241 on February 5, 2019. (Doc. 40; Doc. 53). Defendant's Motion to Determine Competency stems from an alleged weightlifting accident in which "[h]e was exercising

while balancing prone on a large inflatable ball, with heavy dumbbells in each hand" and the exercise ball burst, causing Defendant to fall "backwards on the floor suffering head and neck trauma, loss of consciousness, and a traumatic brain injury." (Doc. 53, Ex. A at 8). Since this alleged accident, Defendant has allegedly had problems with memory, attention, responsiveness, and speech. (*See id.* at 9).

In support of his Motion to Determine Competency, Defendant filed a competency evaluation performed by Dr. Jeffrey Danziger, who was retained by Defendant's counsel. (*See* Doc. 53, Ex. A). Dr. Danziger evaluated Defendant on January 21, 2019 and reviewed all of Defendant's medical records and other relevant documents so he could provide an opinion as to Defendant's competency. (*Id.* at 7). Dr. Danziger concluded that Defendant is not competent to proceed to trial, and that he suffers from a mental defect that "renders him unable to understand the nature and consequences of the proceedings against him, and unable to assist properly in his defense." (*Id.* at 12). Dr. Danziger concluded that Defendant's "incompetency is of a permanent nature." (*Id.* at 13).

The Government concurred in Defendant's Motion to Determine Competency and requested that "the court commit the defendant to the custody of the Attorney General for a competency evaluation pursuant to Title 18 U.S.C. §§ 4241 and 4247(b)." (Doc. 57 at 2). In its Motion, the Government stated that it had evidence to suggest Defendant was malingering and that he did not in fact suffer from a mental disease or defect that would render him incompetent to stand trial. (*Id.* at 2-5). The Government cited to recorded

2

phone calls, Defendant driving without assistance, filing a civil lawsuit as a "competent adult individual," making a police report, and other events in which Defendant appears to participate in the normal activities of daily life uninhibited. (*Id.*). The Government also included a neuropsychological evaluation completed by Dr. Joel Morgan in May 2014, long before Defendant was indicted on the instant charges, in which Defendant "presented himself in a manner very similar to his presentation with Dr. Danzinger." (*Id.* at 3). Dr. Morgan concluded:

> His overall presentation is completely implausible. Real demented patients do not act this way. Real psychotic patients do not act this way. There is consistent, convergent, multiple data that are clearly and unquestionably consistent with malingering. One would literally have to have one's head in a vice to present like this – and then it wouldn't look like this, really, because his presentation is not consistent with any known neurologic or psychiatric disorder. But the evidence on neuropsychological testing, where there was clear evidence of deliberately selecting the wrong answers and deliberately not answering questions truthfully and honestly; this, in conjunction with his total implausible presentation, provide consistent data unequivocally associated with malingered psychopathology and malingered neurocognitive dysfunction.

(Doc. 57, Ex. F at 60).

After reviewing the Motions from Defendant and the Government, the Court ordered Defendant to surrender himself to the custody of the Attorney General for a psychiatric examination in accordance with 18 U.S.C. §§ 4241 and 4247. (Doc. 63 at 3). The parties agreed to Defendant's surrender to the Metropolitan Correctional Center ("MCC") in New York, NY on April 15, 2019. (Doc. 67 at 1).

3

After Defendant's evaluation at MCC concluded, the Court received Defendant's competency evaluation written by Dr. Kari M. Schlessinger. (Doc. 76). Dr. Schlessinger explains, "[o]verall, Mr. Royce is experiencing symptoms that would interfere with his ability understand the nature of his charges, courtroom proceedings, or his ability to consult with his attorney." (*Id.* at 19). She opined that Defendant "does not have a rational and factual understanding of the proceedings against him, and he is incapable of assisting counsel with his defense." (*Id.* at 20). Dr. Schlessinger concluded:

1. Regarding the issue of Mental Disease or Defect, it is the opinion of this evaluator that Mr. Royce currently does not present with a Mental Disease under the law. Mr. Royce currently does present with a Mental Defect under the law, that being Unspecified Neurocognitive Disorder.

2. Regarding the issue of Competency to Stand Trial, it is the opinion of this evaluator Mr. Royce currently does not possess a rational and factual understanding of the proceedings against him and does not have the capacity to assist legal counsel in his defense, nor can he rationally make decisions regarding legal strategy.

3. If in the wisdom of the Court, Mr. Royce is determined Not Competent to Stand Trial, it is recommended Mr. Royce is committed for a period of restoration to competency, pursuant to Title 18, U.S.C., Section 4241d.

4. Based on Mr. Royce's self-report, psychological testing, and presenting symptoms, he appears to suffer from cognitive deficits. However, there is also evidence to suggest Mr. Royce is exaggerating the severity of his cognitive deficits, but no neurological records are available. As such, it is recommended Mr. Royce undergo a complete neurological evaluation that contains brain imaging, which will allow for a more conclusive diagnostic picture.

(*Id.* at 21).

Following the receipt of Dr. Schlessinger's evaluation, the Court held a hearing on September 29, 2020 to determine whether Defendant suffered from a mental disease or defect that rendered him mentally incompetent to stand trial. (Doc. 104). At the hearing, Dr. Schlessinger testified that "while Defendant does have a mental defect that would go toward him not being competent and does have difficulties communicating, at this point, and, also, had difficulty recognizing some parts of the courtroom, it is also my determination that he is exaggerating the level of these deficits." (Doc. 112 at 4). Dr. Schlessinger concluded, "[w]hile the deficits do make him not competent, he also is showing way more deficits that he should be showing." (*Id.*). At the hearing, Defendant's counsel and Government counsel agreed that Defendant was not competent to stand trial. (*Id.*). The Court therefore determined by a preponderance of the evidence that Defendant suffered from a mental disease or defect rendering him mentally incompetent and, in accordance with 18 U.S.C. § 4241(d), the Court ordered Defendant committed to the custody of the Attorney General. (*Id.* at 5). Pursuant to 18 U.S.C. § 4241(d), Defendant self-surrendered to the Mental Health Unit of FMC-Butner on April 13, 2021 and his competency evaluation began on April 16, 2021 and lasted until August 10, 2021. (Doc. 115; Doc. 116 at 4).

On October 25, 2021, the Complex Warden for FMC-Butner submitted its forensic evaluation of Defendant prepared by Tracy O'Connor Pennuto, J.D., Ph.D. (Doc. 116). Dr. Pennuto opined that Defendant "does not currently suffer from a mental disease or defect that would preclude him from proceeding to trial." (*Id.* at 23). Dr. Pennuto certified that

5

Defendant "is able to understand the nature and consequences of the proceedings against

him and to assist properly in his own defense." (*Id.* at 3). Specifically, Dr. Pennuto stated:

> Although the determination of Mr. Royce's competency to proceed is ultimately
> a decision for the Court, it is my opinion that Mr. Royce does not currently suffer
> from a mental disease or defect that would preclude him from proceeding to
> trial. Currently, he appears to be malingering both language deficits and a lack
> of legal knowledge. Despite his feigned language presentation, he is still able
> to understand the information provided to him, and still able to effectively
> communicate, albeit briefly and more slowly. Regarding his feigned lack of
> legal knowledge, Mr. Royce's cognitive functioning is broadly intact, including
> the ability to learn and retain verbal information, as demonstrated in his current
> neuropsychological assessment. In addition, his neuroimaging is normal, and
> he has demonstrated the ability to learn and retain other information during his
> study period, indicating no physiological reason for him to have difficulty
> learning and remembering competency-related information about his case and
> the court. On the basis of current observations, he is capable of cooperating
> fully, attending adequately, communicating relevantly albeit slowly and briefly,
> and maintaining appropriate courtroom behavior, if he chooses to do so. In my
> opinion, he is competent to stand trial.

(*Id.* at 22). After it received this competency evaluation, the Court scheduled a Competency

Hearing for November 22, 2021 to determine Defendant's competency. (Doc. 117 at 1).

At the November 22, 2021 Competency Hearing, the Government presented Dr.

Pennuto via videoconference as its only witness, and Defendant did not present any

witnesses or testify on his own behalf. During her testimony, Dr. Pennuto testified in

accordance with her report and described the tests she administered to Defendant and

Defendant's results for the Court.

The first test discussed by Dr. Pennuto was the Structured Inventory of Malingered

Symptomatology Test, which is used to measure the genuineness of Defendant's responses

and symptoms.  (Comp. Hr'g Tr. at 11:16-22).  Dr. Pennuto testified that Defendant's results

did not elevate any of the five indices included in the test, which "indicates that his

responses were genuine, they appeared to be genuine, and he was not feigning symptoms

on that particular measure." (*Id.* at 13:22-25).  Dr. Pennuto administered a variety of other

tests designed to measure whether Defendant gave good effort in his responses, and based

on Defendant's performance, she concluded that Defendant "was adequately engaged in

the testing process." (*Id.* at 15:15-19).

     Dr. Pennuto next described the tests used to measure Defendant's executive

functioning skills.  In particular, Dr. Pennuto explained that Defendant performed in the "high

average range" on the Trail Making Test and Defendant's "performance showed, not only

intact processing speed, but, also, there was no evidence of cognitive inflexibility or a

difficulty with set-shifting or multitasking cognitively." (*Id.* at 16:8-16).  Defendant performed

in the average range and displayed "intact average working memory and attention skills" on

the Digit Repetition Skills Test.  (Comp. Hr'g Tr. at 16:23-24).  Based on Defendant's

results, Dr. Pennuto concluded that Defendant's "executive functioning was intact and he

had no problems with his executive functioning." (*Id.* at 17:2-5).

     Dr. Pennuto also discussed Defendant's results on learning and memory tests.

Defendant scored in the average range on the California Verbal Learning Test 3 and

"showed a healthy learning curve, [and] he showed benefit from repeated presentations of

the information, as would be expected from someone who can learn and remember well."

(*Id.* at 17:13-19).  Dr. Pennuto explained that "[a]fter a delay, his free recall was low average

. . . but with cueing his recall was average," and that "after a longer delay, both his ability to

remember the words freely and with cueing was average."  (*Id.* at 17:20-23).  On the Brief

Visuospatial Learning Station Memory Test Revised, which assesses learning and memory

abilities, Defendant scored in the "low average range, however, his delayed recall of this

information was average."  (*Id.* at 18:12-20).  Dr. Pennuto explained that Defendant "again,

showed a healthy learning curve with benefit after each trial or repetition of information."

(Comp. Hr'g Tr. at 18:21-22).  Defendant received a perfect score on the recognition

subtest, suggesting that his "recognition memory was intact."  (*Id.* at 18:24-25).  Dr. Pennuto

concluded that based on this portion of the evaluation, Defendant's "verbal and visual

learning and memory abilities were intact."  (*Id.* at 18:24-19:3).

Dr. Pennuto then focused on her assessment of Defendant's language abilities.

Using the Multilingual Aphasia Examination ("MAE") Token Test, Dr. Pennuto evaluated

how well Defendant understood other people.  (*Id.* at 19:12-14).  On the first MAE Token

Test subtest, Defendant "performed in the average range" and "had no difficulty

understanding basic language ability" and his "basic language comprehension was good."

(*Id.* at 19:14-23).  On the second subtest, which uses "larger, more complex vocabulary,"

Defendant's "performance dropped a bit to the high end of the borderline range, which

suggests low average." (Comp. Hr'g Tr. at 19:24-20:7).  Dr. Pennuto interpreted

Defendant's MAE Token Test results for the Court, stating, "regarding his receptive

language abilities, verbal receptive language abilities, his basic information is intact, but

when information becomes more complex, his performance dropped slightly.  But his

reading ability appeared intact."  (*Id.* at 20:10-14).  Dr. Pennuto added, "[h]e didn't report or

didn't present as though he had any difficulty with reading any of the other written

measures, instructions or questions that were provided to him" and she noted that

Defendant could "read and sign multiple medical forms, while he was here, as well, without

question or problem."  (*Id.* at 20:21-25).

Although Defendant's test results show that he could understand others well and had

intact reading abilities, she noted that Defendant presented with unusual speech and

expressive language deficits that were not compatible with his alleged head injury.  Dr.

Pennuto said:

> [Defendant] presents with very brief, choppy responses, as though he was having a difficult time saying the words he wanted to say.  He stuttered. Oftentimes, they were whole word stutters.  And he used what's called telegraphic speech, in which he uses primarily, just content words, and leaves out all the connectors and – you know connector words.
>
> So I think some of the things that stood out to me with Mr. Royce's speech was that the first time I met him in Receiving and Discharge Department, when he first arrived at the FMC, he still presented with difficulty speaking, but when I asked him questions that he couldn't or didn't want to answer, he said, I don't know.
>
> But throughout the rest of the study period, he presented with very child-like pronoun swaps that is sometimes referred to as caveman speech, and he would say, Me don't know, Me don't remember, Me don't know.
>
> So switching the pronouns like that from I to me, it does sound child-like and caveman-like, but it's not consistent with what we know about brain

dysfunction and about speech deficits and compromises.  So, really, there are aspects of his presentation that raised concerns about him being non-genuine or basically faking his speech fluency difficulties.

(*Id.* at 22:1-22).  Dr. Pennuto testified that she has not treated other individuals who use "pronoun swaps," but she had seen other individuals with "stuttering and disfluency and some telegraphic speech, but not to the extent that Mr. Royce did and not based on a mild head injury with a clean MRI."  (*Id.* at 30:12-23).

Dr. Pennuto did not to formally assess Defendant's expressive language ability because "at that point, I had determined that Mr. Royce was feigning his language presentation, and it didn't make sense to give him tests that would not be valid or interpretable." (Comp. Hr'g Tr. at 21:4-6; 36:8-12).  She stated:

No, I can't say for certain that [Defendant's expressive language abilities are] perfectly fine, however, based on my observation of his verbal abilities and other tests, as I mentioned, including his ability to repeat back digit span, his ability to perform in the average range on verbal wordlist tests, his ability to express himself effectively, to get his needs known and his needs met, that, although, I do not believe that his language deficits are as he is presenting them, I can't, for certain, say that they're perfectly fine, but that any tests that I might administer would be invalidated, due to his feigned verbal presentation.

(*Id.* at 37:13-22).  Dr. Pennuto testified that if his speech deficits "were genuine, and he was presenting with such pronounced speech fluency deficits that purportedly occurred due to a head injury, I would absolutely expect to see some structural changes or damage in the language areas of his brain." (*Id.* at 23:12-16).  Defendant's MRI, however, came back completely normal and showed "no damage, not only in the language portion of his brain but not anywhere in his brain." (*Id.* at 23:17-21).

10

Finally, Dr. Pennuto described Defendant's results on the tests administered to

assess his knowledge about the legal process.  On the Inventory of Legal Knowledge, used

to determine "whether someone will be honest and forthcoming about their actual [legal]

knowledge," Defendant's score "fell below the cut score, indicating that he was feigning

deficits in legal knowledge."  (*Id.* at 25:4-12).  On the Revised Competency Assessment

Instrument, a test that assesses fourteen areas of legal knowledge and competency-related

information, Defendant's responses made "clear" to Dr. Pennuto that Defendant "was

feigning his legal knowledge." (Com. Hr'g Tr. at 26:5-27:2).  Dr. Pennuto described

Defendant's performance on the legal knowledge portion of the evaluation as follows:

> **A.** So I asked Mr. Royce things like basic information, What are you charged with? He said, Me don't know.  So I reviewed that information with him.  He said, First time tell, as if no one had ever told him what his charges were or reviewed this information with him before.
>
> He said he wasn't familiar with the evidence in his case, he said he didn't know if he was charged with a felony or a misdemeanor.  And then when I asked him which was more serious, a felony or misdemeanor, he said he didn't know but guessed a misdemeanor was more serious.
>
> So I already knew, based on his performance on the ILK, that he may not be completely forthcoming with me, but I was not anticipating that he was – that he would say he didn't remember any of his charges, have never been told, so it was clear to me that he was feigning his legal knowledge.
>
> **Q.** So were his responses regarding legal knowledge inconsistent with your findings, when you assessed his learning and memory?
>
> **A.** Absolutely.   Because his performance on the learning and memory measures showed that he can learn and remember information, both verbal and visual, in an average manner, an average ability range, there's no reason why he would not be able to learn and remember information about his case.

11

> And, in fact, the literature shows that information that is personally relevant to someone or more emotionally salient to someone is more readily remembered than just random information that one would be presented with on tests that I administered, such as word lists and geometric designs.
>
> So the idea that he can learn and remember this, you know, basically irrelevant information to him, but he can't even remember what his charges are, it's impossible.

(*Id.* at 26:13-27:18).

Ultimately, Dr. Pennuto diagnosed Defendant with malingering, which she defined as the "purposeful feigning of deficits in knowledge or ability for some secondary gain." (*Id.* at 27:19-25). According to Dr. Pennuto, Defendant did not meet the diagnostic criteria for any other neurocognitive or psychiatric disorders. (*Id.* at 28:1-13).[1]

## III. ANALYSIS

Section 4241 mandates that the court hold a hearing to evaluate a defendant's competency to stand trial "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). The hearing, conducted pursuant to Section 4247(d), provides the defendant "an opportunity to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-

---

[1] At the conclusion of the November 22, 2021 Competency Hearing, Defendant's counsel and the Government chose not to file post-Hearing briefings or other motions. (Comp. Hr'g Tr. at 46:14-21).d

examine witnesses who appear at the hearing."  18 U.S.C. § 4241(c); 18 U.S.C. § 4247(d).

The court may order a psychiatric or psychological examination of the defendant to provide

evidence for the competency hearing.  18 U.S.C. § 4241(b); *see also United States v.*

*Haywood*, 155 F.3d 674, 680 (1998).  Competency hearings contemplated by Section 4241

are "intended to culminate in a record-based judicial determination of competence."  *United*

*States v. Graves*, 722 F.3d 544, 547 (3d Cir. 2013) (quoting *Haywood*, 155 F.3d at 680).

 "A defendant is competent to stand trial if (1) the defendant has the present ability to

consult with [defense counsel] with a reasonable degree of rational understanding and (2)

the defendant has a rational as well as factual understanding of the proceedings."  *United*

*States v. Leggett*, 162 F.3d 237, 242 (3d Cir. 1998) (internal quotations omitted); *Jermyn v.*

*Horn*, 266 F.3d 257, 283 (3d Cir. 2001) ("To be competent to stand trial, a defendant must

have a 'sufficient present ability to consult with his lawyer with a reasonable degree of

rational understanding' and must possess 'a rational as well as factual understanding of the

proceedings against him.'" (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)).

"Requiring a criminal defendant to 'be competent has a modest aim: It seeks to ensure that

he has the capacity to understand the proceedings and to assist counsel.'"  *United States v.*

*Brown*, 2015 WL 1573365, at *2 (E.D.Pa. April 8, 2015) (quoting *Godinez v. Moran*, 509

U.S. 389, 402 (1993)).  The court may consider multiple factors when determining whether a

defendant is competent to stand trial, including but not limited to, "'evidence of a defendant's

irrational behavior, [the defendant's] demeanor at trial, and any prior medical opinion on

competence to stand trial.'" *Leggett*, 162 F.3d at 242 (quoting *Drope v. Missouri*, 420 U.S. 162, 180 (1975)).

In this case, Defendant has undergone a years-long process to determine whether he is competent to stand trial.  Based upon the extensive record developed throughout this process, the Court finds that the Government has proven, by a preponderance of the evidence, that Defendant does not presently suffer from a mental disease or defect that renders him incompetent to stand trial.  The Court is satisfied that the record demonstrates that Defendant can understand the nature and consequences of the criminal proceedings against him and can consult with his attorney with a reasonable degree of rational understanding, if he chooses to do so.

At the outset, Dr. Morgan, Dr. Schlessinger, and Dr. Pennuto all diagnose Defendant with malingering.  (Doc. 57, Ex. F at 60 (diagnosing Defendant with malingering, concluding that "the overall presentation of this man can only be described as unsophisticated malingering"); Doc. 76 at 12-14 (diagnosing Defendant with malingering, explaining that Defendant "appears to be exaggerating the nature of his cognitive deficits in an attempt to avoid returning to court to proceed with his current charges); Doc. 116 at 21 (diagnosing Defendant with malingering, noting that Defendant "appears to be malingering both lack of legal knowledge and language deficits")).  Dr. Danzinger, who was retained by Defendant's counsel, is the only doctor that does not diagnose defendant with malingering and concludes that Defendant has a mental defect that renders him permanently incompetent to

14

stand trial.  (Doc. 53, Ex. A at 12-13); *see also Brown*, 2015 WL 1573365, at \*14 ("Dr.

Malamut and Dr. Mechanick – the doctors retained by Defendant – concluded that the

memory loss is attributable to a diagnosis of Mild Neurocognitive Disorder.").

   "When presented with competing expert reports, as is the case here, the district

court judge, who is in the best position to evaluate credibility of experts, is permitted to

assign greater weight to some opinions over others or altogether reject certain expert

opinions."  *Brown*, 2015 WL 1573365, at \*12 (collecting cases).  In considering the four

reports in the record, the Court finds the evaluations of Dr. Morgan, Dr. Schlessinger, and

Dr. Pennuto, all of whom diagnose Defendant with malingering, to be the most persuasive.

*See id.* ("We recognize that Dr. Mechanick concludes that Defendant is not presently

competent to stand trial, while Dr. Voskanian, Dr. Anthony, and Dr. Summerton conclude

that she is competent.  We find the testimony and opinions of Dr. Voskanian, Dr. Anthony,

and Dr. Summerton to be more persuasive.").  While Dr. Morgan, Dr. Schlessinger, and Dr.

Pennuto find that Defendant was malingering to varying degrees, the common thread

among these evaluations is that Defendant's symptoms and test results are contradictory,

inconsistent with his alleged head injury and known brain dysfunction pathology, and

unsupported by his brain imaging.

   Furthermore, out of Dr. Danzinger, Dr. Schlessinger, and Dr. Pennuto, the three

doctors that evaluated Defendant in connection with this case, Dr. Danzinger spent the least

amount of time with Defendant.  Dr. Danzinger's evaluation of Defendant only consisted of

one interview on one day, while Dr. Schlessinger spent six days with Defendant and Dr.

Pennuto evaluated Defendant from April 16, 2021 to August 10, 2021.  (Doc. 53, Ex. A at 7;

Doc. 76 at 1; Doc. 116 at 4).  Dr. Schlessinger and Dr. Pennuto, both of whom diagnosed

Defendant with malingering, "had the ability to observe and evaluate Defendant over an

extended period of time," which is not true of Dr. Danzinger.  *Brown*, 2015 WL 1573365, at

*12.  Because that Dr. Schlessinger and Dr. Pennuto spent significantly more time

evaluating and observing Defendant, the Court considers and relies more heavily on their

opinions regarding Defendant's competency.  *See id.*

   Although Dr. Schlessinger and Dr. Pennuto both diagnosed Defendant with

malingering, they reached different conclusions as to Defendant's competency.   Dr.

Schlessinger found that Defendant was not competent to stand trial and Dr. Pennuto

determined that Defendant was competent to stand trial.  (Doc. 76 at 21; Doc. 116 at 22).

These conclusions, however, are not contradictory.  Dr. Pennuto spent more time evaluating

Defendant and therefore had more data upon which to base her final conclusion regarding

Defendant's competency.  *See Brown*, 2015 WL 1573365, at *12.  Additionally, Dr.

Schlessinger did not have access to any of Defendant's brain imaging, such as MRI scans,

and she noted in her report that her evaluation of Defendant was complicated by her lack of

neurological records.  (Doc. 76 at 13, 21).  Dr. Schlessinger's conclusion that Defendant

was not competent to stand trial at the time of her evaluation is related to the fact that she

did not have neurological records or brain imaging and because Defendant exaggerated his

deficits. (*Id.* at 14 ("Due to a lack of neurological records and evaluations of premorbid

functioning, in addition to Mr. Royce's exaggeration of his cognitive deficits, a more specific

diagnostic picture is precluded.")); *see also Brown*, 2015 WL 1573365, at *13 (explaining

that a psychiatrist did not believe Defendant understood the significance of his case, but

also noting that "this may well be related to what Dr. Mechanick also perceived as

Defendant's aversion to her criminal charges, and her tendency to 'willfully avoid' dealing

with her case."). Dr. Schlessinger recommended that Defendant have an MRI because

getting "a complete neurological evaluation that contains brain imaging . . . will allow for a

more conclusive diagnostic picture." (*Id.* at 21).

In contrast, Dr. Pennuto had access to an up-to-date MRI of Defendant's brain as

part of her evaluation of Defendant's competency. (Doc. 116 at 7). Dr. Pennuto testified

that Defendant's MRI was "completely normal" and showed no signs of brain damage,

change, or trauma. (Comp. Hr'g Tr. at 44:15). Because Dr. Pennuto reviewed Defendant's

brain imaging, she had a more comprehensive understanding of Defendant's neurocognitive

functioning than Dr. Schlessinger and could compare the MRI results against Defendant's

symptoms. Dr. Pennuto testified to this point:

> **Q.** Going back to Government Exhibit 3, which is Dr. Schlessinger's report. I
> know Defense counsel had directed your attention to Page 13, the last
> paragraph. If you want to take a moment and look at that last paragraph on
> Page 13.
>
> There, Dr. Schlessinger reports and notes that, "There are no
> neurological records that contain brain imaging available", at the bottom of that
> paragraph. Do you see where she wrote that?

17

**A.** Yes, I do see that.

**Q.** So since her report, were you able to look at brain imaging?

**A.** Yes, we obtained our own MRI of his brain, while he was here.

**Q.** Was that helpful in your assessment of Mr. Royce?

**A.** Absolutely.

. . .

**Q.** Further down in that paragraph, Dr. Schlessinger states;

"The level of impairment Mr. Royce is reporting on neuropsychological testing and during interviews seems to be inconsistent with the type of traumatic brain injury he sustained."

Do you agree with that sentence?

**A.** I do.

**Q.** Why?  What type of traumatic brain injury did he report that he sustained?

**A.** He reported that he sustained a mild head injury eight years ago.  And for a mild head injury, most people recover completely within a short period of time. And, you know, eight years later, we certainly would expect him to have complete return of function.

For someone to have the profound language deficits that Mr. Royce purportedly presents with, I would expect there to be evidence of brain trauma, particularly, left-sided brain in the language areas, that is simply not there.

As I testified earlier, not only are there no brain changes or deficits, structural changes or damage in the language areas of his brain, there's no brain changes or damage, at all.  Mr. Royce's brain appears completely normal.

> That certainly doesn't indicate that he never suffered any brain injury, at all, but it does indicate that he didn't suffer a brain injury significant enough to profoundly impact his language functioning.

(*Id.* at 42:6-44:19). Accordingly, the Court views the competency reports authored by Dr. Schlessinger and Dr. Pennuto as complementary to one another, instead of contradictory. The commonalities among their evaluations, such as their conclusions that Defendant feigned his legal knowledge and language deficits, support a finding that Defendant is malingering and has consistently used these tactics to appear mentally incompetent.

As described in great detail above, Dr. Pennuto testified at the Competency Hearing about Defendant's performance during his evaluation at FMC-Butner. Defendant's scores indicated that he put forth adequate effort and provided genuine answers on tests that measured cognition and memory, he has average to high average executive functioning skills, showed no signs of cognitive inflexibility, and his written and auditory receptive language abilities are intact. (Comp. Hr'g Tr. at 15:11-19; 17:2-5; 19:2-3; 20:10-14; 21:1-3).

Defendant's performance significantly differed on the legal knowledge portion of the evaluation, leading both Dr. Schlessinger and Dr. Pennuto to the conclusion that Defendant feigned his legal knowledge. (*See* Doc. 76 at 14; Doc. 116 at 19-20). Instead of performing in the low average, average, or high average ranges, which would have been consistent with Defendant's results on the other portions of his evaluation at Butner, Defendant's score on the Inventory of Legal Knowledge ("ILK") was so low that it indicated that he feigned deficits in legal knowledge. (Comp. Hr'g Tr. at 25:11-12). Dr. Pennuto reported that

Defendant had also feigned knowledge on the ILK when Dr. Schlessinger administered it to

him during his MCC evaluation at MCC. (*Id.* at 25:13-18). At MCC, "his score was so low

that someone could have guessed and performed as well or better than him." (*Id.* at 25:16-

17). Dr. Pennuto's testimony, supported by her competency evaluation and Dr.

Schlessinger's competency evaluation, demonstrates that Defendant feigned legal

knowledge on the ILK two times to two separate evaluators.

　　　In addition to feigning responses on the ILK, Defendant feigned competency-related

information on the Revised Competency Assessment Instrument ("RCAI"). During the

RCAI, which is designed as a semi-structured interview, Defendant said that he did not

know what he was charged with, nobody had ever told him his charges, he was not familiar

with the evidence in his case, and did not know whether he was charged with a felony or

misdemeanor. (Comp. Hr'g Tr. at 26:5-22). Dr. Pennuto explained that Defendant's

responses on the RCAI made it "clear" that he feigned legal knowledge. (*Id.* at 26:23-27:2).

　　　Dr. Pennuto testified that there was no reason why Defendant could learn and

remember information that was "basically irrelevant" to him on the learning and memory

portions of the competency evaluation but could not learn and remember personally

relevant information regarding his case on the legal knowledge portion of the evaluation.

(*Id.* at 27:6-18). Defendant's learning, memory, and executive functioning skills are intact

and, according to Dr. Pennuto, the only reason for the stark contrast in Defendant's

performance on the legal knowledge section is that Defendant malingered his cognitive

deficits. (*Id.* at 27:19-22; *see also* Doc. 116 at 21-22). Due to Defendant's failure to be

honest regarding his legal knowledge and information related to his case, Dr. Pennuto

opined that Defendant's "report of his competency-related knowledge, particularly regarding

his case, is suspect and likely a significant underreporting." (Doc. 116 at 20).

In addition to his feigned responses on the legal knowledge tests, Defendant's

"exaggerated" speech deficits are well documented and provide strong support that

Defendant is malingering. Dr. Schlessinger noted that Defendant "had difficulty identifying

language to respond to questions throughout the evaluation and provided very short, or

even one-worded answers to several questions posed to him." (Doc. 76 at 12). She also

reported that even though Defendant "was observed to have difficulties with expressive

speech and provided short responses, his responses were logical, coherent, and relevant."

(*Id.*). Dr. Pennuto identified similar deficits in Defendant's speech and said that Defendant

had an "unusual speech pattern" that consistent of "stuttering, severe disfluency, [and]

telegraphic speech" that was inconsistent with the alleged brain injury Defendant suffered.

(Doc. 116 at 21). Dr. Pennuto testified that when she first met Defendant, he had difficulty

speaking, but would respond "I don't know" when appropriate. (Comp. Hr'g Tr. at 7-12).

When the competency evaluation began, however, Defendant "presented with very child-

like pronoun swaps" and "would say, Me don't know, Me don't remember, Me don't know."

(*Id.* at 22:13-16). Dr. Pennuto explained that this type of language behavior "is not

consistent with what we know about brain dysfunction and about speech deficits or

compromises" and added that these speech patterns "raised concerns about him being non-genuine or basically faking his speech fluency difficulties." (*Id.* at 22:17-22).

Moreover, Defendant's MRI results support the conclusion that Defendant malingered his speech difficulties. Dr. Pennuto explained that if Defendant's speech deficits were genuine, she "would absolutely expect to see some structural changes or damage in the language area of his brain." (Comp. Hr'g Tr. at 23:12-16). However, "there was no damage, not only in the language area of his brain but not anywhere on his brain. His MRI was completely normal." (*Id.* at 23:19-21).

In her competency report, Dr. Pennuto noted that "[d]espite his expressive speech difficulties, Mr. Royce has demonstrated that he is able to advocate for himself and communicate to work with others when he chooses to do so." (Doc. 116 at 20). Additionally, Defendant was able to make phone calls throughout the evaluation period at FMC-Butner and on the calls, "he presented as alert and oriented, with excellent recollection of important information and tracking of events," and could recall staff members with whom he interacted and he knew the length of the study period. (*Id.* at 11). The language difficulties Defendant presented with during his evaluations are also at odds with the events listed in the Government's Motion for Competency Evaluation. (*See* Doc. 57 at 2-5). The Government's Motion describes Defendant engaged in lengthy telephone conversations, filing a lawsuit as a "competent adult individual," making a police report regarding items stolen from his backyard, driving, and participating in events with family and friends. (*Id.*).

22

Viewing Defendant's competency evaluations from Dr. Schlessinger and Dr. Pennuto alongside Defendant's reported symptoms, his "normal" MRI, and the uncontested events listed in the Government's Motion to Determine Competency, it is evident to the Court that Defendant employs techniques that he believes will make him appear mentally incompetent to stand trial when he believes it will benefit his criminal case, but he can otherwise "communicate to work with others when he chooses to do so." (Doc. 116 at 20); *see United States v. Calloway*, 2013 WL 1694803, at * 5 (D.N.J. April 18, 2013) ("In sum, Calloway was entirely coherent, logical and goal-directed except when he thought that it served his purposes to appear to be mentally incompetent, such as when he was being tested and evaluated by the psychologists."). This evidence provides strong support for the conclusion that Defendant is malingering his speech and neurocognitive difficulties, and he chooses to engage in these behaviors when he believes they will hinder the progression of his case. Although Defendant's scores on the learning, memory, and cognition portions of the competency evaluation were valid and revealed that Defendant provided truthful answers, the Court is not precluded from determining that Defendant feigned his legal knowledge and his language deficits on the evaluation. *See Brown*, 2015 WL 1573365, at *14 ("Although Defendant's score on the Test for Memory Malingering ("TOMM") administered by Dr. Malamut showed that she put forth adequate effort on that test, we are not convinced that this precludes a finding that she has exaggerated her memory loss during parts of her psychiatric and psychological testing.").

23

Defendant failed to refute or otherwise mount a serious challenge to Dr. Pennuto's report or testimony wherein she concludes that Defendant is competent to stand trial and malingered his neurocognitive deficits. Defendant did not present any evidence that would contradict the Government's assertions that Defendant could function normally and was feigning his neurocognitive symptoms to avoid prosecution. (*See* Doc. 57 at 2-5).

After reviewing all of the evidence in the record, the Court accepts the conclusions of Dr. Pennuto that Defendant is competent to stand trial and "he is capable of cooperating fully, attending adequately, communicating relevantly albeit slowly and briefly, and maintaining appropriate courtroom behavior, if he chooses to do so." (Doc. 116 at 22). "Despite his feigned lack of legal knowledge, he has demonstrated some factual knowledge of the roles of key trial participants, the adversarial nature of the proceedings, and is aware of his right to benefit from counsel." (*Id.* at 20); *see United States v. Calloway*, 2012 WL 1981518, at *5 (D.N.J. May 31, 2012) ("[T]he Court accepts the conclusions of the FMC Butner report and finds by a preponderance of the evidence that Defendant is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense if he chooses to be cooperative."); *see also United States v. Tucker*, 2010 WL 3516852, at *17 (E.D.Pa. Sept. 3, 2010). Defendant "appears cognitively intact and psychiatrically stable," he has showed that he can learn and retain new factual information, and his brain imaging shows no trauma or damage. (Doc. 116 at 22). These

24

factors indicate that Defendant can understand the nature and consequences of these proceedings and assist in his defense, if he chooses to do so.

The Court therefore finds, by a preponderance of the evidence, that Defendant is able to understand both the nature and consequences of the proceedings against him and he is able to assist properly in his own defense, if he chooses to do so. *See Tucker*, 2010 WL 3516852, at *17 ("[W]e are compelled to conclude that the Government has proven, by a preponderance of the evidence, that Defendant does not suffer from a mental disease or defect that renders him incompetent to stand trial."). Multiple psychologists have concluded that Defendant is malingering his neurocognitive symptoms, which appears to be a choice that Defendant has consistently made over the last several years, likely in an attempt to avoid returning to court and facing the charges against him. (*See* Doc. 76 at 14 ("He appears to be exaggerating the nature of his cognitive deficits, in an attempt to avoid returning to court to proceed with his current charges"); Comp. Hr'g Tr. at 43:7-18 ("I agree that he appears to be exaggerating, and I assume it is to avoid returning to court, yes.")). "A choice to be uncooperative and make oneself appear incompetent is not actual incompetence." *Calloway*, 2012 WL 1981518, at *5. Accordingly, Defendant does not currently suffer from a mental disease or defect, and he is mentally competent to stand trial.

## IV. CONCLUSION

Based on the foregoing, the Court finds Defendant competent to stand trial.  A

separate Order follows.

Robert D. Mariani
United States District Judge